[Civ. No. 67621. Second Dist., Div. Two. Sept. 14, 1983.]

ALEXANDER H. POPE, as County Assessor, etc.,
Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent;
DELTA TOWERS JOINT VENTURE, et al.,
Interveners and Respondents.

**COUNSEL**

John H. Larson, County Counsel, and Lawrence B. Launer, Deputy County Counsel, for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Philip C. Griffin, Deputy Attorneys General, for Defendant and Respondent.

Latham & Watkins, Thomas G. Bost, John J. Clair, Jr., David F. Pursel, Donald J. Drew, Musick, Peeler & Garrett and Kenneth A. Holland for Interveners and Respondents.

**OPINION**

**GATES, J.**—Plaintiff Alexander H. Pope, the County Assessor of the County of Los Angeles (appellant), appeals from the judgment entered in favor of defendant Board of Equalization of the State of California (Board) and interveners Delta Towers Joint Venture, Plaza Development Associates, First Interstate Tower and St. Mary Medical Center (interveners).[1] Appellant characterizes the issues on appeal as follows:

---

[1]For some unexplained reason St. Mary Medical Center was included in the court's judgment, even though it earlier had requested its complaint be dismissed with prejudice.

"[I.] Is the interpretation provided by the staff of the Board that *one* construction project may involve multiple separate and distinct improvements which are capable of being 'completed' apart from each other which then each become an 'entire portion of property which is newly constructed' consistent with the legislative intent of Section 71 of the Revenue and Taxation Code and Rule 463, or is the Plaintiff's interpretation of Section 71 and Rule 463 that a final appraisal must be made when the entire project is completed correct?

"[II.] Is the interpretation provided by the staff of the State Board that an improvement is complete and available for use prior to the selection and installation of major tenant improvements consistent with the legislative intent of Section 71 of the Revenue and Taxation Code Rule 463, or is Plaintiff's interpretation of Section 71 and Rule 463 that property is not complete and available for use prior to the installation of major tenant improvements correct?

"[III.] Was the determination of specific base year values for the properties owned by the Intervenors properly before the trial court?"

Article XIII A, added to the California Constitution by the electorate's adoption of Proposition 13 at the June 1978 primary, requires real property to be assessed at its full cash value, as defined, or in the case of property newly constructed after the 1975 lien date, at its appraised value when newly constructed. (Art. XIII A, § 2, subd. (a).)[2]

In the three-week period between the election and the effective date of this article, the Legislature enacted three implementing bills governing such property assessments. In addition, the Board, pursuant to its statutory grant of authority,[3] adopted rules 460 through 467 (Cal. Admin. Code, tit. 18, §§ 460-467), to deal more broadly with the issues raised by article XIII A. One of these rules, 463, defined "newly constructed property," a concept not addressed by the Legislature until Assembly Bill No. 1488 (AB 1488) was approved the following year. (Stats. 1979, ch. 242.) That bill added Revenue and Taxation Code section 70, defining "new construction" and

---

[2]For purposes of subdivision (a) of section 2 of Article XIII A, "full cash value" of real property newly constructed after the 1975 lien date is determined by its fair market value on the "date on which new construction is completed, and if uncompleted, on the lien date." (Rev. & Tax. Code, § 110.1, subd. (a)(2)(A).) The value so established "shall be known as the base year value for the property." (*Id.*, subd. (c); italics added.)

[3]The Board has the responsibility to "[p]rescribe rules and regulations to govern . . . assessors when assessing . . ." and to "[p]repare and issue instructions to assessors designed to promote uniformity throughout the state . . . in the assessment of property for the purposes of taxation . . . ." (Gov. Code, § 15606, subds. (c), (e).)

"newly constructed,"[4] and section 71, which provides: "The assessor shall determine the new base year value for the portion of any taxable real property which has been newly constructed. The base year value of the remainder of the property assessed, which did not undergo new construction, shall not be changed. New construction in progress on the lien date shall be appraised at its full value on such date and each lien date thereafter until the date of completion, at which time the entire portion of property which is newly constructed shall be reappraised at its full value." (See also, Cal. Admin. Code, tit. 18, § 463, subds. (a), (d).)

The Board amended rule 463 in response to AB 1488 and ultimately repealed it, replacing it with the current version which became effective August 22, 1979.[5] (See exhibit A, attached hereto.) Thereafter, in an effort to clarify and illustrate the rule's application to "construction in progress," the Board directed an interpretive memorandum dated May 8, 1980, to all county assessors. In that document (attached to this decision as exhibit B), the Board observed, "it is possible that when the construction project is completed in stages, with some portions available for occupancy prior to the completion of the total project, base years and base values can be separately established for the completed portions without regard to the incomplete status of the total project." The Board pointed out that the "assessor must use judgment in determining whether or not portions of a project can be considered complete for purposes of base year valuation. If the project is to be constructed in distinct stages, with portions being completed and available for use before the other portions are constructed, then it is proper to assign a base year and base value to the completed portions. If, however, the project is to be constructed as a single facility and the entire improvement will become available for occupancy within a reasonably short period of time, the total project will be handled as construction in progress until

---

[4] "'Newly constructed' and 'New construction' means:

"(1) Any addition to real property, whether land or improvements (including fixtures), since the last lien date; and

"(2) Any alteration of land or of any improvement (including fixtures), since the last lien date which constitutes a major rehabilitation thereof or which converts the property to a different use." (Rev. & Tax. Code, § 70, subd. (a).)

"Any rehabilitation, renovation, or modernization which converts an improvement or fixture to the substantial equivalent of a new improvement or fixture is a major rehabilitation of such improvement or fixture." (Rev. & Tax. Code, § 70, subd. (b). See also Cal. Admin. Code, tit. 18, § 463, subds. (b), (c).)

[5] In a report on the implementation of Proposition 13 prepared by the Assembly Revenue and Taxation Committee, it was recognized that "perhaps more so than in any other assessment area, what constitutes new construction is very largely determined by the Board rule, which as amended in response to AB 1488 expands the existing statutory language significantly." (Assem. Rev. and Tax. Com. Rep., Implementation of Proposition 13, Vol. 1, Property Tax Assessment (Oct. 29, 1979) p. 30, hereinafter Assembly Revenue and Taxation Committee Report dated Oct. 29, 1979.)

all of the improvement is available for occupancy. In other words, the incidental occupancy of a portion of such an improvement would not trigger the separate base year valuation of the occupied portion unless there will be a significant time delay before the balance of the improvement is complete. When a project is available for occupancy but is vacant simply for lack of tenants, it should be considered complete and its base year value determined.''

In challenging the judgment, appellant takes the position, as he did below, that rule 463, and in particular subdivision (e) thereof, as interpreted by the Board's memo of May 8, 1980, is in direct conflict with section 71 of the Revenue and Taxation Code.

■ Where a statute empowers an administrative agency to adopt regulations, the regulations to be valid or effective "must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose." (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 679 [94 Cal.Rptr. 279, 483 P.2d 1231]; Gov. Code, § 11342.2.) ■ While an administrative agency's construction of one of its own regulations obviously deserves great weight, nonetheless its ultimate interpretation and legality remain questions of law whose resolution must rest with the courts. (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032]; *Simplicity Pattern Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 900, 905 [167 Cal.Rptr. 366, 615 P.2d 555].)

■ Appellant initially notes that section 71's requirement that there be a reappraisal of the "entire portion of property which is newly constructed," creates an ambiguity whenever "a singularly designed and physically integrated project is completed in distinct and separate phases."[6] He would construe its terms to mean that "at the time the improvement is finally completed, the *entire improvement* should be reappraised at its *then* current market value." In support of this interpretation he advances the theory that "[i]f there were to be multiple portions which were to receive separate appraisals, which is the added value concept . . . then there would be no final reappraisal of the new[ly] constructed portion and consequently no base year value determined that bore any reasonable relationship to the market value of the completed development." This, he concludes, would

---

[6]Appellant defines an "integrated project" as "one in which the various components of new construction are physically interdependent, i.e., foundations, utility services, parking, architectural compatibility, etc."

result in impermissible discrimination against projects completed within one year.[7]

We are unpersuaded by appellant's reasoning. The simple fact that a number of structures within a given commercial or industrial development may be "physically integrated," as that term is used by appellant, is not necessarily determinative. Inasmuch as a complete reappraisal of newly constructed property must occur upon completion thereof, i.e., at the time the property is available for use, a more meaningful inquiry is whether or not a given unit within a multiple structure development is capable of being occupied and utilized without regard to the completion of the remaining structures. If it is, then a base year date and value should be set at that time. Such an approach does not result in the type of discrimination against short term projects which the Legislature sought to avoid.

We also observe that although the Legislature to date has failed to address this issue directly, its inaction clearly is not the result of ignorance as to the nature of the controversy. On May 28, 1980, almost immediately upon the dissemination of the Board's memo, an amendment to Senate Bill No. 1260 was proposed which, if approved, would have resulted in the adoption of the methodology advocated by appellant.[8] However, this amendment was

---

[7]In the Assembly Revenue and Taxation Committee Report dated October 29, 1979, it was noted that: "New construction *in progress* on the lien date will be appraised at its full value on such date and each lien date thereafter until the date of completion, at which time the entire portion of property which was newly constructed will be reappraised at its full value.

"The complete reappraisal upon completion of multi-year construction was added in Committee to ensure that treatment of major commercial and industrial developments should be equated with small construction projects which are completed within one year, and to ensure that the bias previously mentioned against residential property regarding turnover rates and change in ownership was not further exacerbated by an additional shift in tax burden due to new construction.

"Without a final appraisal of the entire newly constructed portion of a property, assessors would be almost forced to use the cost approach, to value without ever having the opportunity to apply the income approach under which a base year value could be established that bears a reasonable relationship to the market value of the completed development. Projects completed within one year would thus be discriminated against, as their final value would be proportionately greater than that given to a multi-year project, where, in effect, the sum of the parts would be less than the whole. This was of special concern since homes are usually constructed within a year, while commercial-ventures may take several years before final completion."

[8]The May 28, 1980, version of the bill contained the following language: "SEC. 3.7. Section 71 of the Revenue and Taxation Code is amended to read:

"71. The assessor shall determine the new base year value for the portion of any taxable real property which has been newly constructed. The base year value of the remainder of the property assessed, which did not undergo new construction, shall not be changed. New construction in progress on the lien date shall be appraised at its full value on such date and each lien date thereafter until the date of completion, at which time the entire portion of property which is newly constructed shall be reappraised at its full value.

"For purposes of this chapter, the date of completion is the date the new construction is

eliminated from the bill in its entirety on July 9, 1980. In addition, we note that one of the topics discussed in the Assembly "briefing book" of October 1982 prepared by the staffs of the Revenue and Taxation Committee and the Local Government Committee is the present litigation between appellant and the Board, to which are attached copies of the statutory provisions relating to new construction, rule 463, the parties' trial briefs and appellant's proposed definition of new construction, as set forth in footnote 8. (Briefing Book for Joint Assem. Com. Interim Hg., The Property Tax Four Years After Proposition 13 (Oct. 1982) pp. 71-148.) No disapproval of the Board's standard has been located in any of these materials.[9] As a consequence, we can only conclude that the standard proposed by the Board was in accord with the Legislature's intent.

■ The second area wherein appellant questions the validity of the Board's actions relates to the "date of completion" of new construction. Subdivision (e) of Board rule 463 defines "date of completion" as "the date the property or portion thereof is available for use. In determining whether the real property or a portion thereof is available for use, consideration shall be given to the date of the final inspection by the appropriate governmental official, or, in the absence of such inspection, the date the prime contractor fulfilled all of his contract obligations, or in the case of fixtures, the date of the completion of testing of machinery and equipment."

. Appellant contends that the meaning of the phrase "date of the final inspection by the appropriate government official" is confusing and urges that property should not be deemed "available for use" until all major tenant improvements are installed.

Insofar as the City of Los Angeles is concerned, a final certificate of occupancy issues when a building has been completed in conformity with the applicable regulations set forth in the Los Angeles Municipal Code. (Mun. Code, §§ 12.26(E)(1)(a), 91.0315.) This certificate, which authorizes the structure's use, is issued without regard to tenant improvements. In our view this is precisely the type of certificate contemplated by the Board in rule 463.

---

available for use. *In determining the unit where various components of new construction are completed for different lien dates, any development originally designed and completed within a reasonable period of time as an integrated project will be valued on a unitary basis."* (Italics added.)

[9]The Legislature has shown itself to be quite capable of acting when it is in disagreement with the Board, e.g., its basic definition of "newly constructed" (Rev. & Tax. Code, § 70) differed from that in the Board's original rule 463 because it was felt the Board's test was "too all-encompassing." (Assem. Rev. & Tax. Com. Rep. dated Oct. 29, 1979, pp. 30-31, fn. 16.)

It is customary for each tenant of the type of construction project here under consideration to design and prepare plans and specifications for his own improvements upon execution of the lease. Moreover, as old tenants vacate their premises, the new lessees are wont to alter the former tenants' improvements to meet their own particular needs and tastes. In fact, it is the very nature of tenant improvements to produce a state of flux throughout the economic life of the building. It is, therefore, reasonable to characterize a building as "available for use" at the point its final certificate of occupancy issues, regardless of whether the tenant improvements are substantially complete. The value of such improvements may be added each lien year as they are actually installed.

In contrast to the Board's approach, appellant proffers a standard by which "the date of completion would be established when the entire project was 'substantially ready for occupancy.'" He asserts such a test "take[s] into account the period of time necessary to complete the project by posing the question, 'was the project completed within a reasonable period of time giving full consideration to the magnitude of the development and the normal time to complete the project?'" By way of example, appellant's application of his standard to the downtown construction projects of interveners First Interstate Tower and Plaza Development Associates yielded the following results:

First Interstate Tower commenced its development, consisting of a highrise office building and multilevel parking structure with office space on the first floor, in June 1970. Final certificates of occupancy were issued for the two structures in April 1974. The primary contractor's notice of completion was accepted by First Interstate Tower and was recorded on May 14, 1974. Nevertheless, appellant took the position that the project was not complete until 1978, at which time 84 percent of the rentable floor space "was ready for occupancy," i.e., when tenant improvements were in place. He reasoned that *to wait any longer* would exceed the " 'reasonable period of time' test."

The construction project of Plaza Development Associates, consisting of the Broadway Department Store, the Hyatt Regency Hotel, the "700 Building," an enclosed mall and a parking garage, commenced in May 1971. Final certificates of occupancy were issued in November 1973 and April 1974. Appellant concluded that only in 1978, when 96 percent of the rentable floor space was ready for occupancy, was the project complete for purposes of setting a base year.

Aside from the fact that appellant's foregoing approach is not supported by the language of either section 71 or Board rule 463, which the Assembly

Revenue and Taxation Committee has cited with approval, it also injects a much more speculative and subjective element into the appraisal formula than does the standard advanced by the Board.

In any event, that portion of the Assembly Revenue and Taxation Committee Report dated October 29, 1979, treating with the meaning of the term "date of completion," contains the following comment: "Rule 463(e) defines this time as the date the property or portion thereof is available for use, subject to various considerations." Elsewhere in the report, it is noted that "what constitutes new construction is very largely determined by the Board rule, which as amended in response to AB 1488 expands the existing statutory language significantly." In light of these observations, we cannot assume that the Legislature was either unaware of, or dissatisfied with, the standard adopted by the Board.

■ Finally, appellant challenges the propriety of the trial court's selection of base year values for the improvements owned by interveners, asserting section 538 of the Revenue and Taxation Code "only confers upon the [c]ourt jurisdiction to declare a state board rule valid or invalid."[10] Although section 538 encourages intervention by potential assessees "to the greatest extent practicable," we tend to agree with appellant that the statute does not contemplate an assessee's placing in issue the proper base year for the assessment of its property simply by intervening in a declaratory relief action filed under section 538.

Nevertheless, in the instant case the interveners, in their respective complaints, each sought a declaration from the trial court that 1975 constituted the proper base year for their properties. Appellant made no attempt to have this issue excluded until after the cause had been submitted and the court had given notice of its intended decision. Under the circumstances, the court properly overruled appellant's belated objection.

---

[10]Section 538 specifies in pertinent part: "(a) If the assessor believes that a specific provision of the Constitution of the State of California, of this division, or of a rule or regulation of the board is unconstitutional or invalid, and as a result thereof concludes that property should be assessed in a manner contrary to such provision, or the assessor proposed to adopt general interpretation of a specified provision of the Constitution of the State of California, or this division, or of a rule or regulation of the board, that would result in a denial to five or more assessees in that county of an exemption, in whole or in part, of their property from property taxation, the assessor shall, in lieu of making such an assessment, bring an action for declaratory relief against the board under Section 1060 of the Code of Civil Procedure. The court shall allow intervention in such action by potential assessees and other assessors under Section 387 of the Code of Civil Procedure to the greatest extent practicable. . . ."

The judgment is affirmed.

Compton, Acting P. J., and Beach, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 21, 1983.

Exhibit A

**463. Newly Constructed Property.**

(a) When real property, or a portion thereof, is newly constructed after the 1975 lien date, the assessor shall ascertain the full value of such "newly constructed property" as of the date of completion. This will establish a new base year full value for *only* that portion of the property which is newly constructed, whether it is an addition or alteration. The taxable value on the total property shall be determined by adding the full value of new construction to the taxable value of preexisting property reduced to account for the taxable value of property removed during construction. The full value of new construction is only that value resulting from the new construction and does not include value increases not associated with the new construction.

(b) "Newly constructed" or "new construction" means and includes:

(1) Any substantial addition to land or improvements, including fixtures, such as adding land fill, retaining walls, curbs, gutters or sewers to land or constructing a new building or swimming pool or changing an existing improvement so as to add horizontally or vertically to its square footage or to incorporate an additional fixture, as that term is defined in this section.

(2) Any substantial physical alteration of land which constitutes a major rehabilitation of the land or results in a change in the way the property is used.

Examples of alterations to land to be considered new construction are:

Site development of rural land for the purpose of establishing a residential subdivision.

Altering rolling, dry grazing land to level irrigated crop land.

Preparing a vacant lot for use as a parking facility.

In any instance in which an alteration is substantial enough to require reappraisal, only the value of the alteration shall be added to the base year value of the pre-existing land or improvements. Increases in land value caused by appreciation or a zoning change rather than new construction shall not be enrolled, for example:

1. Land value 1975 = $10,000
2. Land value 1978 = $20,000
3. Value of alteration 1978 = $5,000
4. Value of structure added 1978 = $75,000
1979 roll value (1+3+4) = $90,000 (must be adjusted to reflect appropriate indexing)

Alterations to land which do not constitute a major rehabilitation or which do not result in a change in the way the property is used shall not result in reappraisal.

(3) Any physical alteration of any improvement which converts the improvement or any portion thereof to the substantial equivalent of a new structure or portion thereof or changes the way in which the portion of the structure that had been altered is used, e.g., physical alterations to an old structure to make it the substantial equivalent of a new building without any change in the way it is used or alterations to a warehouse that makes it usable as a retail store or a restaurant. Only the value, not necessarily the cost, of the alteration shall be added to the appropriately indexed base year value of the pre-existing structure.

(4) Excluded from alterations that qualify as "newly constructed" is construction or reconstruction performed for the purpose of normal maintenance and repair, e.g., routine annual preparation of agricultural land or interior or exterior painting, replacement of roof coverings or the addition of aluminum siding to improvements or the replacement of worn machine parts.

(5) Any substantial physical rehabilitation, renovation or modernization of any fixture which converts it to the substantial equivalent of a new fixture or any substitution of a new fixture.

Substantial equivalency shall be ascertained by comparing the productive capacity, normally expressed in units per hour, of the rehabilitated fixture to its original productive capacity.

(c) For purposes of this section, "fixture" is defined as an improvement whose use or purpose directly applies to or augments the process or function of a trade, industry, or profession.

(d) New construction in progress on the lien date shall be appraised at its full value on such date and each lien date thereafter until the date of completion, at which time the entire portion of property which is newly constructed shall be reappraised at its full value.

(e) For purposes of this section, the date of completion is the date the property or portion thereof is available for use. In determining whether the real property or a portion thereof is available for use, consideration shall be given to the date of the final inspection by the appropriate governmental official, or, in the absence of such inspection, the date the prime contractor fulfilled all of his contract obligations, or in the case of fixtures, the date of the completion of testing of machinery and equipment.

(f) Newly constructed property does not include real property which is timely reconstructed after a disaster where the full value of such real property, as reconstructed, is substantially equivalent to its full value prior to the disaster. If the values are not substantially equivalent, the assessor shall on lien date following restoration:

(1) Enroll the restored property at its former taxable value plus or minus the appropriate inflation adjustment, or

(2) Enroll the current market value of the restored property if the current market value is less than the value found in Item 1 above, or

(3) Enroll the value found in Item 1 above plus the market value of any newly constructed property if it is determined that new construction has occurred.

For purposes of this subsection only, newly constructed property does not include any land, improvement or fixture that is restored, reconstructed or repaired in a timely manner following a disaster and which is substantially equivalent in size, use and quality to that which existed prior to the disaster.

(g) For property under reconstruction or restoration as a result of disaster which changes ownership prior to the completion of reconstruction or restoration, the value of the land and existing improvements shall be determined as of the date of the change in ownership but the value of any reconstruction or restoration which occurs following the transfer shall be determined as of the date of completion in accordance with the provisions applicable to new construction but without regard to the "substantially equivalent" test normally applicable to property reconstructed following a disaster.

NOTE: Authority cited: Section 15606(c), Government Code. Reference: Article XIII A, Sections 1 and 2, California Constitution.

HISTORY:

1. New section filed 7-3-78 as an emergency; effective upon filing (Register 78, No. 27).

2. Amendment filed 10-2-78 as an emergency; effective upon filing. Certificate of Compliance included (Register 78, No. 40).

3. Order which was filed 10-2-78 refiled 10-20-78 as an emergency, to correct date of adoption; effective upon filing. Certificate of Compliance included (Register 78, No. 43).

4. Amendment of subsection (b) and new subsection (c) filed 1-31-79; effective thirtieth day thereafter (Register 79, No. 6).

5. Amendment of subsection (b) and new subsection (c) refiled 2-7-79 as an emergency; designated effective 3-1-79. Certificate of Compliance included (Register 79, No. 6).

6. Repealer and new section filed 8-22-79 as an emergency; effective upon filing (Register No. 79, No. 34). A Certificate of Compliance must be filed within 120 days or emergency language will be repealed on 12-20-79.

7. Certificate of Compliance filed 12-6-79 (Register 79, No. 49).

### 464. Exemptions

Article XIII A does not repeal any property tax exemptions granted or authorized by the Constitution on or before July 1, 1978. The property tax rate shall apply to the current taxable value less any exemptions applicable to a specific property. Examples of the application of partial exemptions are as follows:

EXHIBIT B

STATE OF CALIFORNIA ·

## STATE BOARD OF EQUALIZATION

1020 N STREET, SACRAMENTO, CALIFORNIA
BOX 1799, SACRAMENTO, CALIFORNIA 95808)

(916) 445-4982

GEORGE R. REILLY
First District, San Francisco

ERNEST J. DRONENBURG, JR.
Second District, San Diego

WILLIAM M. BENNETT
Third District, San Rafael

RICHARD NEVINS
Fourth District, Pasadena

KENNETH CORY
Controller, Sacramento

DOUGLAS D. BELL
Executive Secretary

May 8, 1980

No. 80/77

TO COUNTY ASSESSORS:

#### CONSTRUCTION IN PROGRESS

Board Rule 463 states: "New construction in progress on the lien date shall be appraised at its full value on such date and each lien date thereafter until the date of completion, at which time the entire portion of property which is newly constructed shall be reappraised at its full value." The rule further states that for purposes of this section, the date of completion is the date the property or portion thereof is available for use. Therefore, it is possible that when the construction project is completed in stages, with some portions available for occupancy prior to the completion of the total project, base years and base values can be separately established for the completed portions without regard to the incomplete status of the total project.

The assessor must use judgment in determining whether or not portions of a project can be considered complete for purposes of base year valuation. If the project is to be constructed in distinct stages, with portions being completed and available for use before the other portions are constructed, then it is proper to assign a base year and base value to the completed portions. If, however, the project is to be constructed as a single facility and the entire improvement will become available for occupancy within a reasonably short period of time, the total project will be handled as construction in progress until all of the improvement is available for occupancy. In other words, the incidental occupancy of a portion of such an improvement would not trigger the separate base year valuation of the occupied portion unless there will be a significant time delay before the balance of the improvement is complete. When a project is available for occupancy but is vacant simply for lack of tenants it should be considered complete and its base year value determined.

A special problem is created if a construction project comes to an unscheduled halt for an extended period. When there are no definite plans for continuation of construction within a reasonable period, the project no longer qualifies as construction in progress and the assessor should establish a base year value for the newly constructed improvements without regard to their incomplete status.

The following examples are intended to clarify the base year concept when construction is not complete on the lien date.

EXAMPLE 1: Assume that a shopping center project is being built in stages. One large anchor building and a wing of adjacent stores are complete and occupied on the lien date. The master plan calls for the construction of another anchor building and a group of peripheral buildings in the next year. The completed improvements can be viewed as an independent phase and a base year value assigned. On the other hand, if the initial stage (the anchor building and adjacent stores) is incomplete on the lien date, it should be valued as construction in progress.

EXAMPLE 2: Assume a high-rise structure has the first level complete and the upper levels completed except for interior finishing on the lien date. The plans call for the upper level to be finished as they are leased. In this case the entire structure, as it exists on the lien date, should be given a base year and base value. The interior finishing work will be picked up as new construction on the date or dates of completion.

EXAMPLE 3: Assume the first store in a commercial building that will contain six stores is complete and occupied, but the other units are under active major construction. Indications are that the work will progress continuously for another few months until completion. Should the assessor determine a separate base year value for the occupied portion? In this instance the entire project should be treated as construction in progress until the basic structure is essentially complete. Completion need not include interior finish as indicated in Example 2.

EXAMPLE 4: A residence presents a somewhat different type of problem, particularly recreational homes and owner-builder structures. As sometimes happens, assume an owner moves into his owner-builder structure before it is fully complete with the intention of finishing it while living there. Further assume that after a period of years the owner still has not finished the structure. The valuation procedure now becomes questionable. It is not proper to continue valuing this structure year after year as construction in progress. On the other hand, the structure is technically incomplete. The assessor should use his judgment and establish a base year and base year value when it appears that the structure is "substantially equivalent" to a completed home and is a livable unit. Finishing at a later date should be handled as new construction.

Sincerely,

*Verne Walton*

Verne Walton, Chief
Assessment Standards Division

VW:dg